**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| MICHAEL CURRIE et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 8:12-cv-02461-AW |
| WELLS FARGO BANK, N.A. et al., | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

The instant case sounds in mortgage fraud. Plaintiffs have filed an eight-Count Complaint totaling forty-six pages. Defendants have filed a Motion to Dismiss in which they seek the dismissal of each and every Count of the Complaint. The Court has carefully reviewed the record and deems a hearing unnecessary. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Michael Currie and Kimberly Currie are residents of the state of Maryland. Before a foreclosure sale, Plaintiffs owned real property located at 4305 Thames Court, Upper Marlboro, Maryland 20772 (the Property).

Defendant Wells Fargo Bank, N.A. (Wells  Fargo) is a national banking association with its principal place of business in Arizona. Plaintiffs allege that Wells Fargo also does business as Wells Fargo Home Mortgage (Wells Fargo Home), America's Servicing Company (America Servicing), and Premier Asset Services (Premier Asset). Except as otherwise indicated, the Court collectively refers to Wells Fargo, Wells Fargo Home, America Servicing, and Premier Asset as

"Wells Fargo." Defendant HSBC Bank USA, N.A. (HSBC) is a bank and served as Trustee for Wells Fargo Home Mortgage Asset-Backed Securities 2007-M09 Trust (the Trust). The Trust owned the mortgage loan on Plaintiffs' Property and purchased the Property at a January 20, 2012 foreclosure sale.

On February 27, 1997, Plaintiffs purchased the Property. In 2007, Plaintiffs refinanced their mortgage with Wells Fargo. The amount of the refinanced mortgage was $270,000. In late 2008, Plaintiffs experienced financial hardships. Therefore, Plaintiffs contacted Wells Fargo and asked for a loan modification. An unnamed Wells Fargo representative told them that they had to be in default for ninety days to be "considered" for a loan modification. Doc. No. 1 ¶ 34. In early 2009, Plaintiffs defaulted on their home loan, allegedly in reliance on Wells Fargo's representations.

Sometime thereafter, Plaintiffs requested a loan modification. In late May 2009, Wells Fargo did not provide Plaintiffs with the loan modification they requested. Instead, it offered them a "Special Forbearance Agreement" (Agreement). Under the Agreement, Plaintiffs would have to make monthly payments of $2,600, which was higher than their regular monthly payment of $1,950. Around this time, Wells Fargo informed Plaintiffs that the Agreement was a prerequisite to a loan modification and that their request for modification was denied "because of a failure to adhere to the terms of the forbearance plan." *Id.* ¶ 37.

Shortly thereafter, Wells Fargo Home sent Plaintiffs a foreclosure notice. The notice identified Wells Fargo Home as the secured party when Wells Fargo Home was merely the servicer of the loan and the Trust was the actual secured party. Plaintiffs also allege that Wells Fargo Home concealed the identity of the Trust so that Plaintiffs would not know how to verify the false information that was allegedly provided to them.

Plaintiffs requested another loan modification. In connection with this request, Wells Fargo instructed Plaintiffs to send in a good faith payment of $2,400, which was delivered to Wells Fargo on August 31, 2009. On the same day, however, Wells Fargo denied Plaintiffs' request, asserting that Plaintiffs failed to submit all the required information. Wells Fargo failed to specify what documents were missing. Wells Fargo eventually returned the payment, stating that no plan was in place to receive the funds.

Plaintiffs hired an attorney. The attorney inquired about the status of Plaintiffs' request. Wells Fargo informed the attorney that Plaintiffs did not provide the required documentation and/or did not provide it in a timely fashion. Wells Fargo also stated that it had closed Plaintiffs' loan modification application. Finally, Wells Fargo stated that Plaintiffs needed to submit updated documentation because the old documentation did not comply with federal guidelines.

Plaintiffs faxed Wells Fargo the requested documentation twice in October 2009: once in early October and once on October 30. Yet, on October 30, 2009, Wells Fargo informed Plaintiffs that it had denied their request because it had not received the required information.

In November 2009, Plaintiffs again faxed the requested information. Plaintiffs' attorney spoke with a Wells Fargo representative who told him that Wells Fargo had received all the necessary information. Wells Fargo notified Plaintiffs in a separate communication that it was processing their request and expected to render a final decision within 45 to 60 days.

On December 17, 2009, Wells Fargo offered Plaintiffs another Agreement (Second Agreement). Although the Second Agreement stated that Wells Fargo would accept reduced monthly payments on a temporary basis, the monthly payments thereunder exceeded the $1,932 monthly payments that Plaintiffs were required to make under the home loan. The Second Agreement provided that Wells Fargo would suspend foreclosure proceedings once the initial

installment was received and would continue to do so as long as Plaintiffs adhered to it. Plaintiffs signed the Second Agreement on December 28, 2009. However, Plaintiffs made only two of the three payments required thereunder.

In late March 2010, Wells Fargo sent Plaintiffs another notice of intent to foreclose. In the following month, Plaintiffs reapplied for a loan modification under the Home Affordable Modification Program (HAMP).[1] On June 29, 2010, Plaintiffs faxed the requested documentation to Wells Fargo. But, in July 30, 2010, Wells Fargo denied the request on the ground that Plaintiffs failed to provide the requested documentation.

Apparently, Plaintiffs applied for another loan modification. In response, Wells Fargo notified Plaintiffs in August 2010 that it would consider their request upon the submission of certain documentation. Plaintiffs allege that they had already sent Wells Fargo the information specified in the August 2010 communication.

In late September 2010, Wells Fargo filed an "Order to Docket" in the Circuit Court for Prince George's County, Maryland to initiate foreclosure proceedings. In support of its Order to Docket, Wells Fargo apparently filed an "allonge" to Plaintiffs' mortgage note dated May 25, 2007. According to Plaintiffs, an allonge is basically a slip of paper that allows for information to be added to the note when there is insufficient space on the note itself. Plaintiffs state that the allonge purports to be an assignment of the note to HSBC as Trustee for the Trust. Plaintiffs then state that Wells Fargo Home apparently first recognized HSBC and not Wells Fargo as the secured party around the time Wells Fargo Home was preparing to file the Order to Docket. Plaintiffs further allege that Wells Fargo prepared three foreclosure notices, but that only the last

---

[1] "HAMP was part of Congress's response to the financial and housing crisis that struck the country in the fall of 2008. It provided an incentive for lenders to modify mortgages so that struggling homeowners could stay in their homes." *Spaulding v. Wells Fargo Bank, N.A.*, No. 12–1973, 2013 WL 1694549, at *1 (4th Cir. May 20, 2013) (publication forthcoming) (citing Emergency Economic Stabilization Act of 2008, Pub L. No. 110–343, 122 Stat. 3765 (2008) (codified at 12 U.S.C. §§ 5201 *et seq.*)).

one filed with the Order to Docket identified HSBC as the secured party.[2] Based on these and other irrelevant allegations, Plaintiffs conclude that it is "highly likely" that the allonge was prepared and attached to the note at the time the Order to Docket was filed, not on May 25, 2007 as represented. *See id.* ¶¶ 70–74.

In the same month, Wells Fargo sent another Agreement (Third Agreement). The Third Agreement provided that Plaintiffs would have to pay $886 in September 2010 and $2,949.24 for October through December 2010. Plaintiffs allege that they "agreed to it and made all of the required payments, completing the plan in December 2010." *Id.* ¶ 78.[3]

In January 5, 2011, Plaintiffs spoke with a Wells Fargo representative. The representative told them that they were "approved" for a loan modification at a 4% fixed interest rate with a monthly payment of $1,851.52. The representative further stated that two payments were needed in the January 2011/February 2011 time period. Plaintiffs allege that they made both of these payments on time. Yet, in February 2011, Wells Fargo notified Plaintiffs that they were ineligible for mortgage assistance because they failed to provide it with all the information needed within the required time frame.

Thereafter, Plaintiffs and Wells Fargo engaged in back-and-forth communications regarding whether Plaintiffs had submitted the required information. Allegedly, Wells Fargo falsely stated that Plaintiffs were ineligible for a loan modification because of nonresponsiveness to its requests. Plaintiffs add that Wells Fargo made this statement to facilitate the state court foreclosure proceedings.

---

[2] This allegation may be inconsistent with Plaintiffs' previous allegation that one of the prior notices identified Wells Fargo Home even though the Trust (in contrast to HSBC) was the secured party.
[3] Plaintiffs have not specified whether any of the "Agreements" were Trial Period Plan Agreements (TPP Agreements) pursuant to HAMP. *See generally Spaulding*, 2013 WL 1694549, at *1 (citation omitted).

On April 18, 2011, Plaintiffs and Wells Fargo participated in mediation in connection with the foreclosure proceedings. Plaintiffs allege that the Parties reached a Mediation Agreement whereby Wells Fargo would "evaluate" Plaintiffs for a loan modification if Plaintiffs submitted certain documentation by April 29, 2011. Plaintiffs allegedly faxed Wells Fargo this information in a timely manner.

In August 2011, Wells Fargo declined to modify Plaintiffs' home loan, asserting that Plaintiffs failed to timely submit all the requested information. Sometime later, Wells Fargo allegedly told an unnamed "public official" that it did not consider Plaintiffs' loan modification application because Plaintiffs "asked to be considered for a short sale." *Id.* ¶ 92.

At some point, Plaintiffs applied for a loan modification pursuant to the Home Affordable Foreclosure Alternative (HAFA). Wells Fargo denied this application on the basis that Plaintiffs failed to return the required documentation. In this communication, Wells Fargo stated that it could not offer Plaintiffs a short sale or deed-in-lieu of foreclosure. Subsequently, however, Wells Fargo allowed Plaintiffs to participate in the short sale program.

On January 6, 2012, Plaintiffs submitted a signed, bona fide sales contract to Wells Fargo at a short sale price of $175,000. Plaintiffs allege that Wells Fargo indicated a willingness to consider their bid. However, all of Plaintiffs' information suddenly disappeared from Wells Fargo's online short-sale database available to Plaintiffs' realtor. Plaintiffs were subsequently informed that Wells Fargo could not continue the short sale review because the deadline for the foreclosure date was rapidly approaching. Plaintiffs add that Wells Fargo had "unilateral ability" to extend the date of the foreclosure sale.

The foreclosure sale took place on January 20, 2012. Plaintiffs' Property was purchased for $160,300. This price is $14,700 less than Plaintiffs' short sale purchaser would have paid and

$68,700 less than the fair market value of the Property. The Circuit Court for Prince George's County ratified the foreclosure sale on March 27, 2012.

Plaintiffs filed the instant Complaint on August 17, 2012. Doc. No. 1. Plaintiffs' Complaint contains eight Counts. The first four Counts are for violations of various Maryland consumer/debtor protection statutes. Counts V-VIII, by contrast, assert claims for negligence, breach of contract, and promissory estoppel. On October 1, 2012, Defendants filed a Motion to Dismiss. Doc. No. 10. Although Defendants raise numerous arguments in their Motion to Dismiss, one recurring refrain is that numerous courts have held that plaintiffs cannot assert claims similar to the ones Plaintiffs are asserting based on alleged violations of the HAMP. Plaintiffs generally respond that this line of argumentation is a red herring and that they do not predicate their claims on the HAMP per se. The Parties have completed briefing on Defendants' Motion to Dismiss.

## II. STANDARD OF REVIEW

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In two recent cases, the U.S. Supreme Court has clarified the standard applicable to Rule 12(b)(6) motions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). These cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3 (quoting Fed. R. Civ. P. 8(a)(2)). This showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding a motion to dismiss, the court should first review the complaint to determine which pleadings are entitled to the assumption of truth. *See Iqbal*, 129 S. Ct. at 1949–50. "When

there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. In so doing, the court must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III.    LEGAL ANALYSIS

### A.    Count I (Maryland Consumer Protection Act (MCPA))

Plaintiffs assert a misrepresentation claim under the MCPA. Defendants argue that the claim fails because Plaintiffs failed to (1) satisfactorily plead reliance and damages and (2) plead the claim with particularity.

In pertinent part, the MCPA prohibits commercial entities from engaging in any "unfair or deceptive trade practice" in "[t]he extension of consumer credit" or "[t]he collection of consumer debts." Md. Code Ann., Com. Law § 13-303(4)-(5). The MCPA defines "unfair or deceptive" trade practices to include "false . . . or misleading oral or written statement[s] . . . or other representations . . . [that have] the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* § 13-301(1). Consumers "may bring an action to recover for injury or loss sustained . . . as the result of" such a misrepresentation. *Id.* § 13-408(a). To state a claim under the MCPA, plaintiffs must adequately allege "(1) an unfair or deceptive practice or

misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012) (citation omitted).

As for element (2), consumers must prove that they relied on the misrepresentation in question to prevail on a damages action under the MCPA. *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 235 (Md. 2000) (citing cases). A consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice. *Compare Luskin's, Inc. v. Consumer Prot. Div.*, 726 A.2d 702, 727 (Md. 1999) (rejecting the notion that but-for causation is the proper standard for determining reliance under the MCPA), *with Nails v. S & R, Inc.*, 639 A.2d 660, 669–70 (Md. 1994) (rejecting the argument that but-for causation is the proper test for reliance in the context of fraud and, instead, enunciating a standard of substantial inducement).

Plaintiffs identify the following statements as misrepresentations on which they relied to their detriment: (1) Plaintiffs had to be in default for ninety days to be considered for a loan modification; (2) Wells Fargo would consider Plaintiffs for a loan modification; (3) Wells Fargo had not received all of Plaintiffs' financial information necessary to evaluate them for a loan modification; (4) the Third Agreement would increase the likelihood that Plaintiffs would receive a loan modification; (5) payments under the Third Agreement would be applied to delinquent payments; (6) stating in affidavits filed in court that Wells Fargo did not consider Plaintiffs for a loan modification because Plaintiffs failed to submit the required documentation; and (7) asserting that HSBC had the true and proper legal documents needed to effect a foreclosure.

Statement (1) fails to state a misrepresentation claim under the MCPA. For starters, there is no indication that this statement is a misrepresentation. In other words, Plaintiffs' allegations do not support a plausible inference that it was untrue, misleading, or deceptive to say that

Plaintiffs had to be in default for ninety days to be considered for a loan modification. Moreover, Plaintiffs' allegations do not suggest that they relied on this statement. Plaintiffs admit that they were experiencing financial hardship in late 2008 and asked Wells Fargo about a loan modification. Furthermore, Plaintiffs simply allege that Wells Fargo said that they had to be in default for ninety days before their request would be "considered." These allegations fail to support the inference that Wells Fargo's simple recitation of one the requirements for consideration under the loan modification program substantially induced Plaintiffs to default on their home note. Therefore, statement (1) is not actionable under the MCPA.

Statements (2) and (3) are a compilation of various statements to the effect that Wells Fargo would consider Plaintiffs for a loan modification even though it did not. Plaintiffs allege that this practice amounted a "churning" of their loan modification applications, whereby Wells Fargo managed to "run up late fees and other default related charges and strip cash" from Plaintiffs prior to foreclosure. Taking Plaintiffs' allegations as true and construing them in the most favorable light, Plaintiffs have adequately alleged that statements (2) and (3) constitute violations of the MCPA. Plaintiffs' allegations plausibly support the inference that the representations and actions that statements (2) and (3) embody amount to a deceptive or misleading practice. For instance, Plaintiffs consistently allege that Wells Fargo assured them that it would consider their loan modification requests upon the timely submission of the required information and repeatedly state that they timely submitted such information. As for reliance, Plaintiffs consistently state that they relied on Wells Fargo's assurances that it would consider their requests by, inter alia, repeatedly contacting Wells Fargo and submitting the information that it requested. Although Plaintiffs' allegations indicate that Wells Fargo did consider their request at one point by putting them in the Second Agreement, Plaintiffs allege

that they ended up reapplying for a loan modification and that the prior pattern repeated itself. Moreover, although Defendants argue that Plaintiffs' reliance is not "reasonable," the Maryland Court of Appeals has yet to hold that reasonable reliance is an element of an MCPA misrepresentation claim despite repeated opportunities to do so. *See, e.g.*, *Hoffman v. Stamper*, 867 A.2d 276, 294 (Md. 2005); *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 235 (2000) (citing cases); *see also Bierman*, 859 F. Supp. 2d at 768 (citation omitted); *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 532 (D. Md. 2011). Finally, construing the Complaint favorably, Plaintiffs' allegations plausibly support the inference that they suffered actual injury or loss as a result of statements (2) and (3). Granted, some of Plaintiffs' allegations suggest that many the alleged damages (e.g., foreclosure, late fees, impaired credit) are traceable to Plaintiffs' financial woes and voluntary failure to pay their home note. Be that as it may, Wells Fargo's alleged practice of "churning" Plaintiffs' loan modification requests plausibly resulted in the misallocation of mortgage payments and/or charges beyond those for which Plaintiffs otherwise would have been liable.[4] Accordingly, Plaintiffs have stated a cognizable MCPA misrepresentation claim as to statements (2) and (3).

Statement (4) is also sufficient to state a misrepresentation claim under the MCPA. Plaintiffs allege that, although they failed to comply with the terms of the Second Agreement, they fulfilled the terms of the Third Agreement. Plaintiffs then allege that a Wells Fargo representative told them that they were approved for a loan modification contingent on two additional payments of a certain amount, which Plaintiffs allege they provided. However,

---

[4] Plaintiffs also pray for "emotional distress" damages. It is unclear whether pure emotional distress damages are available in a misrepresentation action under the MCPA. *Compare, e.g.*, *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007), *and Hoffman*, 867 A.2d at 298, *and Citaramanis v. Hallowell*, 613 A.2d 964, 971 (Md. 1992), *with, e.g.*, *Fontell v. Hassett*, 870 F. Supp. 2d 395, 411 (D. Md. 2012), *and Allen v. CitiMortgage, Inc.*, Civil No. CCB–10–2740, 2011 WL 3425665, at *10 (D. Md. Aug. 4, 2011).

Plaintiffs allege that Wells Fargo told them that they were ineligible for mortgage assistance. These allegations support a plausible inference that Wells Fargo made a false, misleading, or deceptive statement to Plaintiffs and that Plaintiffs relied on it. Plaintiffs have adequately alleged the element of causation for the reasons stated in the previous paragraph. Moreover, such a fact-intensive inquiry is generally ill-suited for resolution at the pleading stage. *See Tasciyan v. Med. Numerics*, 820 F. Supp. 2d 664, 673 (D. Md. 2011); *cf. Mitchell*, 822 F. Supp. 2d at 532.

Statement (5), standing alone, is not actionable. Plaintiffs allege that Wells Fargo stated on December 17, 2010 that any installments made under the Third Agreement would be applied to delinquent payments. Plaintiffs then allege that Wells Fargo applied funds from Plaintiffs' payments to late charges. However, Plaintiffs' allegations indicate that Plaintiffs entered into the Third Agreement in September 2010. Therefore, Plaintiffs could not have relied on the subsequent December 17, 2010 statement to enter into the Third Agreement. Nor do any other allegations suggest that Plaintiffs relied on the December 17, 2010 communication. Therefore, standing alone, statement (5) is not actionable. However, Plaintiffs may explore the possibility that Wells Fargo's alleged improper application of their payments under the Third Agreement constitutes actual loss or injury as regards the actionable statements.

Statements (6) and (7) fail to state a misrepresentation claim under the MCPA. Taken at face value, these statements were made to a state court, not to Plaintiffs. However incorrect they may be, Plaintiffs' allegations do not suggest that Plaintiffs somehow relied on these statements with consequent actual injury or loss. To establish reliance under the MCPA, Plaintiffs must plead and prove that the false or misleading statement substantially induced their choice. Plaintiffs have not pleaded sufficient facts from which one can plausibly infer that these allegedly erroneous statements contained in judicial filings induced them to take any action or

that they "substantially" induced any choice. Nor have Plaintiffs adequately alleged actual injury or loss on account of their action, whatever it may be. Consequently, statements (6) and (7) are not actionable under the MCPA.

Defendants argue that Plaintiffs have failed to plead their MCPA claim with particularity. True, MCPA claims that sound in fraud must be pleaded with particularity. *See Spaulding*, 2013 WL 1694549, at *9. This heightened standard "requires a plaintiff to plead 'with particularity the circumstances constituting fraud.'" *Id.* (quoting Fed. R. Civ. P. 9(b)). "The circumstances include the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (citations and internal quotation marks omitted). Here, Plaintiffs have alleged both approximate and specific dates for many of the alleged misrepresentations, the content of many of the misrepresentations, the identity of many of the persons making the misrepresentations (e.g., various Wells Fargo representatives, some of whom are named), and endeavor to explain how these misrepresentations harmed them. Therefore, Plaintiffs have satisfied Rule 9's heightened pleading standard for claims sounding in fraud. *Cf. Allen v. CitiMortgage, Inc.*, Civil No. CCB–10–2740, 2011 WL 3425665, at *9 (D. Md. Aug. 4, 2011) (plaintiffs satisfied Rule 9's heightened pleading standard by alleging "the dates and contents of numerous contradictory letters sent by CitiMortgage that they allege were both misleading and false").

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss as to Plaintiffs' MCPA misrepresentation claim.

**B.      Count II (Maryland Mortgage Fraud Protection Act (MMFPA))**

Section 7-402 of the Real Property Article of the Code of Maryland provides that a "person may not commit mortgage fraud." Md. Code Ann., Real Prop. § 7-402. "Mortgage

fraud" is defined as "any action by a person made with the intent to defraud that involves" any of the following actions:

(1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(4) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1), (2), or (3) of this subsection;

(5) Conspiring to violate any of the provisions of item (1), (2), (3), or (4) of this

subsection; or


(6) Filing or causing to be filed in the land records in the county where a

residential real property is located, any document relating to a mortgage loan that

the person knows to contain a deliberate misstatement, misrepresentation, or

omission.

*Id.* § 7-401(d). In turn, the MMFPA defines "mortgage lending process" as "the process by

which a person seeks or obtains a mortgage loan." *Id.* § 7-401(e)(1). This process includes "[t]he

solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and

funding of a mortgage loan." *Id.* § 7-401(2)(i). For its part, "pattern of mortgage fraud" is

defined as "two or more incidents of mortgage fraud" that: "(1) Involve two or more residential

real properties; and (2) Have similar intents, results, accomplices, victims, or methods of

commission or otherwise are interrelated by distinguishing characteristics." *Id.* § 7-401(g).

Defendants raise six arguments against Plaintiffs' MMFPA claim. The first is that the

activity at issue in this case, which Defendants characterize as "post-default foreclosure

proceedings," does not fall under the MMFPA's definition of "mortgage lending process,"

which includes the "servicing" and "funding" of a mortgage loan. Second, Defendants argue that

the MMFPA sounds in fraud and that Plaintiffs have not pleaded their MMFPA claim with

particularity. Third, Defendants argue that Plaintiffs have failed to state a facially plausible

MMFPA claim. Fourth, Defendants argue that Plaintiffs have not shown any injury on account of

Defendants' allegedly fraudulent practices. Fifth, Defendants argue that this is not the proper

forum to bring challenges to the foreclosure process. Sixth, Defendants argue that res judicata bars Plaintiffs' claims.

All of these arguments are unavailing. As to argument (1), at least two judges in this District have held that the MMFPA "'clearly countenances post-closing servicing activities.'" *Marchese v. JPMorgan Chase Bank, N.A.*, Civil Action No. GLR–12–1480, 2013 WL 136427, at *13 (D. Md. Jan. 8, 2013) (quoting *Stovall v. SunTrust Mortg., Inc.*, Civil Action No. RDB–10–2836, 2011 WL 4402680, at *10 (D. Md. Sep. 20, 2011)). Although Defendants argue that the literal language of the MMFPA dictates otherwise, their reading of the statute is somewhat strained.

As to Defendants' second argument, the MMFPA sounds in fraud and is subject to Rule 9's heightened pleading requirements. However, for the reasons stated in Part III.A, Plaintiffs have pleaded their MMFPA claim with particularity.

Defendants' third argument is unpersuasive. Defendants generally argue that Plaintiffs have not stated a cognizable MMFPA claim because the conduct at issue is not "facially deceptive." As noted, however, Plaintiffs allege that Defendants made numerous false, deceptive, and/or misleading statements in connection with Plaintiffs' repeated requests for a loan modification. The Court further determined that Plaintiffs have sufficiently pleaded actual loss or injury. *Cf. Marchese*, 2013 WL 136427, at *14 (noting that the analysis of MCPA claims and MMFPA claims may overlap). Furthermore, Plaintiffs have alleged that Defendants made false statements in connection with the foreclosure. *Cf. Stovall*, 2011 WL 4402680, at *10. Beyond that, Plaintiffs have alleged that Defendants made these alleged misrepresentations with the intent to defraud. *Cf.* Fed. R. Civ. P. 9(b) (stating that, in alleging fraud, "intent, knowledge, and

other conditions of a person's mind may be alleged generally"). Accordingly, Defendants' third argument lacks merit. Defendants' fourth argument lacks merit for essentially the same reasons.

Defendants' fifth argument misses the mark. Defendants assert that this proceeding is not the proper forum to bring challenges to the foreclosure process. However, Plaintiffs have made clear that they did not bring this suit to unravel the foreclosure. Rather, Plaintiffs seek damages for alleged violations of various state statutes and common law causes of action.

Defendants' sixth argument, albeit colorable, is ultimately unconvincing. Defendants argue that res judicata bars Plaintiffs' MMFPA claim because Plaintiffs voluntarily appeared in the foreclosure proceeding but failed to assert their MMFPA claim therein. Plaintiffs respond that their participation in the mediation, which they characterize as informal, did not constitute an appearance. Plaintiffs also argue that res judicata does not apply because, even if they could have raised their counterclaims/defenses in the foreclosure proceeding, doing so here would not undermine the foreclosure proceeding.

"Under Maryland law, claim preclusion has three elements: (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been determined in prior litigation; and (3) there was a final judgment on the merits in the prior litigation." *Jones v. HSBC Bank USA, N.A.*, 444 Fed. App'x 640, 643–44 (4th Cir. 2011) (citation and internal quotation marks omitted). "In deciding whether the claims are the same, so as to satisfy the second element, Maryland courts employ the 'transaction' test." *Id.* at 644 (citation omitted). "Under this test, claims are the same when they arise out of the same transaction or series of transactions." *Id.* (citation and internal quotation marks omitted).

"In Maryland, a foreclosure action is ordinarily a summary, *in rem* proceeding." *Id.* at 644. "When the mortgagor voluntarily appears and raises objections, however, the action results in an *in personam* judgment with preclusive effect." *Id.* (citations omitted).

Under Maryland law, not all claims raised in a subsequent suit that arise out of the same transaction or series of transactions at issue in a prior suit are barred. *See Rowland v. Harrison*, 577 A.2d 51, 57 (Md. 1990). In *Rowland*, the Court of Appeals of Maryland held that "where the same facts may be asserted as either a defense or a counterclaim, and the issue raised by the defense is not litigated and determined so as to be precluded by collateral estoppel, the defendant in the previous action is not barred by res judicata from subsequently maintaining an action on the counterclaim." *Id.* The Court of Appeals has recognized the applicability of this rule in the mortgage foreclosure proceeding context. *See generally Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship*, 655 A.2d 1265, 1279–80 (Md. 1995). Although the *Fairfax Savings* court held that the plaintiff's subsequent claim was res judicata, it so held based on the conclusion that the allegations in the second suit contradicted and nullified an essential foundation of the foreclosure judgment. *See id.* at 1280.

In this case, Plaintiffs have stated a facially plausible claim that they did not voluntarily appear and raise objections in the foreclosure proceeding. Plaintiffs' allegations support the inference that the mediation amounted to a private meeting with a nonjudicial officer in which no formal objections were made to the merits of the foreclosure action. Although Plaintiffs likely requested the mediation, Defendants have not shed light on the contents of the mediation or identified any specific legal objection or defense raised during the mediation or pressed before the state court. Defendants' argument appears to proceed from the premise that voluntary participation in a mediation post-dating the filing of a foreclosure action pursuant to a statutory

scheme per se converts an *in rem* foreclosure proceeding into an *in personam* proceeding. However, Defendants have cited no binding authority for this proposition, and the few authorities on which they rely are either distinguishable, unpersuasive, or both. Thus, considering the lack of controlling caselaw and paucity of particulars concerning the mediation, the Court declines to decree at this time that Plaintiffs' participation in the mediation turned the foreclosure proceeding into an *in personam* proceeding with preclusive force.

Moreover, it is unclear that res judicata would bar Plaintiffs' claims even if their participation in the mediation converted the foreclosure into an *in personam* proceeding. Although Plaintiffs' claims mainly arise out of the same series of transactions underlying the foreclosure proceeding, it is, at a minimum, plausible that the relief that Plaintiffs request would not contradict or nullify any essential foundation of the foreclosure. Therefore, at this time, the Court declines to dismiss Plaintiffs' MMFPA claim on res judicata grounds.

**C.     Count III (Maryland Consumer Debt Collection Act (MCDCA))**

Pertinently, the MCDCA provides that, in collecting or attempting to collect an alleged debt, a collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8). Plaintiffs argue that Defendants did not have the right to foreclose on their home because, pursuant to various provisions of the Real Property Article, Defendants failed to: conduct a loss mitigation analysis; file a bona fide preliminary loss mitigation affidavit; and file a bona fide final loss mitigation affidavit. *See generally* Md. Code Ann., Real Prop. § 7-105.1. Defendants respond that Judge Bennett has already considered and rejected a substantially similar argument. *See Stovall*, 2011 WL 4402680, at *9.

In this case, Plaintiffs have failed to state a facially plausible MCDCA claim. One cannot meaningfully distinguish this case's facts from *Stovall*'s. There, it was undisputed that the plaintiff had defaulted on her mortgage loan before the defendant initiated the foreclosure proceedings. *See id.* Therefore, the defendant was enforcing a valid right and there was no basis for liability under section 14-202. The plaintiff countered that the defendant lacked the "right" to foreclose on her property because of the improper paperwork. *See id.* The court rejected this contention, reasoning that the defendant's "*right* to foreclose came about when Stovall defaulted on her mortgage." *See id.* Plaintiffs attempt to distinguish this case from *Stovall* on the ground that they have identified at least three specific requirements under the Real Property Article that Defendants allegedly violated, whereas the plaintiff in *Stovall* generally alleged that the defendant filed improper foreclosure documents. Although Plaintiffs' allegations are more specific than those in *Stovall*, this argument is still meritless. Here, as in *Stovall*, Plaintiffs' allegations lead ineluctably to the inference that they defaulted on their home loan due to their financial woes and voluntary decision to stop making mortgage payments. Plaintiffs also acknowledge that they breached the terms of the Second Agreement. And, although Plaintiffs allegedly fulfilled the terms of the Third Agreement, Plaintiffs allege that the Third Agreement was for a loan modification, not necessarily a termination of the foreclosure proceedings. Moreover, as Judge Chasanow has pointed out, most of the decisions in this District have hewed to *Stovall's* holding that, under Maryland law, "the right to initiate foreclosure proceedings typically arises upon the borrower's default." *Piotrowski v. Wells Fargo Bank, N.A.*, Civil Action No. DKC 11–3758, 2013 WL 247549, at *9 (D. Md. Jan. 22, 2013). As a result, the Court dismisses Plaintiffs' MCDCA claim.

**D.     Count IV (Maryland Real Property Article)**

Similar to their MCDCA claim, Plaintiffs allege violations of various provisions of the Maryland Real Property Article. *See generally* Md. Code Ann., Real Prop. § 7-105.1. "An action for failure to comply with the provisions of [section 7-105.1] shall be brought within 3 years after the date of the order ratifying the sale." *See id.* § 7-105.1(q). Defendants raise only a res judicata challenge to Plaintiffs' section 7-105.1 claim. For the purposes of the instant Motion to Dismiss, this argument fails for the reasons stated in Part III.B. However, the Court may later entertain the argument that res judicata bars some of Plaintiffs' claims depending on what discovery reveals about the nature, content, and effect of the voluntary mediation. Thus, at this time, the Court denies Defendants' Motion to Dismiss as to Count IV.

**E.     Count V (Negligence)**

Defendants argue that Plaintiffs' negligence claim fails because they owed Plaintiffs no duty of care. Plaintiffs respond that Defendants owed them a duty of care in light of (1) the requirements of section 7-105.1 and the notion that the failure to comply with them portends serious harm and (2) the contractual relationship between the Parties.

"In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques v. First Nat. Bank of Md.*, 515 A.2d 756, 759 (Md. 1986). Where "the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Id.*

Although contractual privity or its equivalent may satisfy this intimate nexus, not every contractual duty gives rise to a tort duty. *See id.* at 759–60. Indeed, "[c]ourts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Parker v. Columbia Bank*, 604 A.2d 521, 532 (Md. Ct. Spec. App.1992) (citing cases); *see also 21st Century Props. Co. v. Carpenter Insulation and Coatings Co.*, 694 F. Supp. 148, 151 (D. Md. 1988) (citations omitted) (courts "have not profligately permitted indiscriminate recognition of tort causes of action in every contract case"). Furthermore, although the violation of a statutory duty may be evidence of negligence, "[e]ssential to the proof of any cause of action for negligence is the establishment of a legally cognizable duty owed by the defendant to the plaintiff, or to a class of persons to which the plaintiff is a member." *Erie Ins. Co. v. Chops*, 585 A.2d 232, 234 (Md. 1991) (citing *Jacques*, 307 Md. at 531–34). And, as the *Jacques* court pointed out, "a 'tort duty' does not necessarily coexist with a . . . duty imposed by statute." *Id.* (quoting *Jacques*, 307 Md. at 534).

In this case, Plaintiffs' allegations fail to sustain a plausible inference that Defendants owed them a duty of care. The nature of the harm likely to result from the breach of the mortgage agreement or the provisions of section 7-105.1 is economic. Therefore, Plaintiffs must show an "intimate nexus" between the Parties before a tort duty will lie. However, this case presents a typical, arm's-length creditor/debtor relationship founded on a mortgage loan. Plaintiffs have not identified any language—whether statutory or contractual—purporting to place a special duty of care on Defendants and have not alleged any "extraordinary circumstances" counseling for the imposition of a tort duty. *See Green v. Wells Fargo Bank, N.A.*, Civil Action No. DKC 12–1040, 2013 WL 766196, at *7 (D. Md. Feb. 27, 2013) (publication forthcoming). Therefore, although

Plaintiffs may stand in contractual privity with Defendants, "the alleged nexus is insufficiently intimate to warrant the imposition of a tort duty." *See Chubb & Son v. C & C Complete Servs.*, *LLC*, Civil Action No. 8:12–cv–01127–AW, 2013 WL 336718, at *5 (D. Md. Jan. 23, 2013) (publication forthcoming). As a result, the Court dismisses Plaintiffs' negligence claim.

**F.      Counts VI and VII (Breach of Contract)**

Plaintiffs have asserted two Counts for breach of contract based on the following theories: (1) Wells Fargo's repeated promises to consider their loan modification application only not to; (2) Wells Fargo's violation of the Third Agreement; (3) Wells Fargo's violation of the Mediation Agreement; (4) the submission of false documents in connection with the foreclosure; and (5) the use of false documentation to avoid considering Plaintiffs for a loan modification. Defendants' primary counterargument is that Plaintiffs' breach of contract claims boil down to allegations that Defendants failed to consummate a permanent HAMP loan modification and courts in this District have refused to recognize a contract under these circumstances.

"Under Maryland law, the formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *Spaulding*, 2013 WL 1694549, at *5 (alteration omitted) (citation and internal quotation marks omitted). "An agreement implied in fact is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* (citation and internal quotation marks omitted). Implied contracts, like all contracts, require mutual assent, a definite agreement, and adequate consideration. *See Goss v. Bank of Am., N.A.*, No. CCB–12–2680, 2013 WL 105326, at *5 (D. Md. Jan. 8, 2013) (citation omitted).

Theory (1) lacks facial plausibility. Although Plaintiffs allege that Defendants repeatedly promised that they would consider Plaintiffs' loan modification requests, these allegations are insufficient to sustain the inference that these promises amounted to an "offer." *See, e.g.*, *Prince George's County v. Silverman*, 472 A.2d 104, 112 (Md. Ct. Spec. App. 1984) (quoting Restatement (Second) of Contracts § 24 (1979)) (defining offer as a "'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it'"). Even assuming that the back-and-forth between the Parties involved offer and acceptance, Plaintiffs' allegations fail to suggest the existence of a sufficiently definite agreement or adequate consideration.

Theory (2), by contrast, suffices to state a facially plausible breach of contract claim. Regarding theory (2), Plaintiffs allege that Wells Fargo sent them the Third Agreement; that Plaintiffs timely made all the payments that the Third Agreement required; that, shortly after making the required payments, a Wells Fargo representative told them that, upon the completion of two more timely payments, they would be approved for a monthly payment of $1,851.52 at a 4% fixed interest rate; and that, although Plaintiffs timely made these two payments, Wells Fargo declared them ineligible for the modification because Plaintiffs failed to timely provide it with the information it needed to evaluate their request. Taken as true and construed favorably, these allegations plausibly support the inference that the Third Agreement amounted to a unilateral offer that Plaintiffs accepted by performing its conditions. Furthermore, although the precise terms of the Third Agreement are somewhat inchoate, the allegations minimally support the inference that the Third Agreement called for a loan modification at a 4% fixed interest rate for a monthly payment of $1,851.52 upon compliance with its conditions precedent. Plaintiffs have adequately alleged the existence of consideration based on their allegations that they submitted

payments of $2,949.24 for October through December 2010, which is approximately $1,000 more than the $1,950 or so regular monthly payment they were required to make. Plausibly, these increased payments constituted "a detriment to the promisee" given in exchange for Wells Fargo's promise to modify the loan. *See Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 661 (Md. 2003) (citation and internal quotation marks omitted). Hence, Plaintiffs have sufficiently stated a breach of contract claim under theory (2).

Theory (3) fails to support a facially plausible breach of contract claim. Plaintiffs allege that Wells Fargo violated the Meditation Agreement. Allegedly, the Mediation Agreement provided that Wells Fargo "would evaluate Plaintiffs for a loan modification if Plaintiffs submitted their loan modification application by April 29, 2012." Doc. No. 1 ¶ 173. Plaintiffs further allege that Wells Fargo failed to evaluate their application and falsely stated that Plaintiffs failed to submit the required paperwork. This theory, although pressed under the rubric of the Mediation Agreement, is indistinguishable from theory (1), which the Court just held failed to support a breach of contract claim. To reiterate, these allegations are insufficient to support the existence of an offer, a definite agreement, or adequate consideration. At most, the allegations suggest that Wells Fargo made a gratuitous promise that it did not honor. *See, e.g.*, *Md. Nat. Bank v. United Jewish Appeal Fed'n of Greater Wash., Inc.*, 407 A.2d 1130, 1138–39 (Md. 1979) (gratuitous promises are unenforceable under Maryland contract law).

Theories (4)-(5), which are brought under the banner of the implied covenant of good faith and fair dealing, are likewise deficient. Under theory (4), Plaintiffs' basic argument is that the alleged submission of false foreclosure documents constituted a breach of the covenant of good faith and fair dealing implicit in the mortgage agreement. However, as discussed, Plaintiffs' allegations lead inescapably to the inference that they defaulted on their home loan due to their

financial troubles and voluntary decision to skip payments. Plaintiffs also stress that they are not contesting the validity of the foreclosure. Thus, Plaintiffs' allegations compel the inference that Wells Fargo had a right to foreclose on the Property. Although Wells Fargo might have submitted improper paperwork in connection with the foreclosure, there is no indication of bad faith or that Wells Fargo acted "in such a manner as to prevent [Plaintiffs] from performing [their] obligations under the contract." *See Mount Vernon Props., LLC v. Branch Banking And Trust Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006) (citation and internal quotation marks omitted). Therefore, theory (4) is not cognizable. Neither is theory (5). Plaintiffs vaguely allege that Wells Fargo used false documents to avoid considering them for a loan modification. This allegation does not support the existence of an express or implied contract, and its connection with the implied covenant of good faith and fair dealing is unclear. Besides, there is no "independent cause of action at law in Maryland for breach of the implied covenant of good faith and fair dealing." *Id.*

For the foregoing reasons, the Court dismisses all of Plaintiffs' breach of contract claims other than theory (2). As theory (2) arises under Count VI, Count VI remains in the suit. However, no cognizable theories arise under Count VII and Maryland does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. Thus, the Court dismisses Count VII with prejudice.

**G.      Count VIII (Promissory Estoppel)**

Plaintiffs found their promissory estoppel claim on the same factual allegations as they found their breach of contract claim. The Court has already determined these allegations to state a cognizable breach of contract claim with respect to theory (2); it follows that they support a

promissory estoppel claim with respect to theory (2). Still, the Court must decide whether

Plaintiffs have stated a cognizable promissory claim with respect to theories (1) and (3)-(5).

Under Maryland law, the elements of promissory estoppel are as follows:

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996) (citation omitted).

The trial court, and not a jury, must determine whether binding the promisor is necessary to

prevent injustice. *Id.* at 533–34.

Judged against this test, theory (1) states a cognizable promissory estoppel claim.

Plaintiffs allege that Wells Fargo repeatedly promised to evaluate them for a loan modification,

that these promises induced them to submit paperwork, and that Wells Fargo's continual failure

to evaluate their requests resulted in the misallocation of mortgage payments and/or the accrual

of penalties. Although it is questionable whether enforcing these promises is necessary to prevent

injustice, the Court gives Plaintiffs the benefit of the doubt due to the early posture of the case.

Theory (3), which is properly understood as a subset of theory (1), is cognizable for essentially

the same reasons.

Theories (4)-(5), however, are not facially plausible. Although the submission of false

documents that these theories posit arguably constitutes one or more promises, these promises

fail to arise to the level of "clear and definite." Consequently, Defendants would not reasonably

have expected for Plaintiffs to rely on them, and any reliance on Plaintiffs' part necessarily

would have been unreasonable. As Plaintiffs have failed to satisfy elements (1)-(3), the Court need not address element (4). Accordingly, the Court dismisses Count VIII as to theories (4)-(5).

### IV. CONCLUSION

In light of the preceding considerations, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss. A separate Order memorializing the Court's rulings follows. The Court will issue a Scheduling Order.

| May 23, 2013 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |